# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
**ANGEL M. CORDERO,**                      )
                                            )
      **Plaintiff**                     )
                                            )
      **v.**                           )      **Civil Action No. 10-12104-DJC**
                                            )
**CAROLYN W. COLVIN,[1]**                  )
**Commissioner,**                          )
**Social Security Administration,**        )
                                            )
      **Defendant.**                    )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                   **September 25, 2013**

## I.    Introduction

Plaintiff Angel Cordero ("Cordero") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Cordero brought this action for judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on April 21, 2010, denying his claim.  Before the Court are Cordero's Motion to Reverse and the Commissioner's Motion to Affirm that decision.  In his motion, Cordero claims that the ALJ erred in denying his claim because:  (1) the ALJ failed to properly assess the severity of his physical and mental impairments; (2) the ALJ ignored evidence from a medical source; and (3) the ALJ erred in assessing his credibility.  For the reasons explained below, the

---

[1] During the pendency of this litigation, Ms. Colvin became the Acting Commissioner of the Social Security Administration.  The Court, therefore, substitutes Ms. Colvin as the defendant in this matter.

Court GRANTS the Commissioner's Motion to Affirm and DENIES Cordero's Motion to Reverse.

## II.      Factual Background

Cordero was born on May 4, 1967 and was thirty–eight years old when he ceased working on June 15, 2005.  See D. 15 at 2; R. 9, 35, 37.[2]  He had previously worked as a shipping/receiving clerk, stockperson, security officer and shoe salesman.  R. 37–40.  In his application for SSDI and SSI with the Social Security Administration ("SSA"), he alleged disability due to diabetes, disc/back problems, anxiety, high blood pressure, high cholesterol, depression, attention deficit disorder ("ADD"), knee problems, ankle problems and carpal tunnel syndrome.  R. 75.

## III.     Procedural Background

Cordero filed claims for SSDI and SSI with the SSA on April, 27, 2007 asserting that he was unable to work as of June 15, 2005.  D. 15 at 1; R. 7.  After initial review, the SSA denied his claims on September 26, 2007.  R. 7.  His claims were reviewed by a Federal Reviewing Official and again denied on November 3, 2008.  R. 7.  On November 13, 2008, Cordero filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 7.  A hearing was held before an ALJ on February 12, 2010.  R. 7.  In a written decision, dated April 21, 2010, the ALJ found that Cordero did not have a disability within the definition of the Social Security Act and denied his claims.  R. 22.

Although the ALJ notified Cordero that the SSA's Decision Review Board ("the Board") selected his claim for review, R. 4, the Board did not complete its review of Cordero's claim

---

[2] "R." refers to the administrative record that is entered at D. 21.

during the requisite time period.  R. 1.  Accordingly, the ALJ's decision is the Commissioner's final decision. R. 1.

## IV.     Discussion

### A.     Legal Standards

#### 1.     *Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether he has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five–step process when she determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920.  The determination of disability may be concluded at any step along the process.  Id.  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  Id.  Second, if the applicant does not have, or has not had within the relevant time period, a severe medically determinable impairment or combination of impairments, then the application is denied.  Id.  Third, if the impairment or combination of impairments meets the conditions for one of the "listed" impairments in the Social Security regulations, then the claimant is considered disabled and the

application is granted.  Id.  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied.  Id.  Fifth and finally, if the applicant, given his RFC, education, work experience, and age, is unable to do any other work, the claimant is considered disabled and the application is granted.  Id.

### 2.   Standard of Review

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).

### B.   Before the ALJ

### 1.   Medical History

There was extensive evidence before the ALJ about Cordero's medical history, particularly in regard to the conditions upon which Cordero relied in his application for SSDI and SSI benefits.  Cordero claimed he suffered from lumbar disc protrusion at L4-L5; insulin dependent diabetes mellitus; obesity; left ankle instability due to a ligament and tendon tear;

degenerative joint disease of both knees; degenerative joint disease of the left shoulder; cervical spondylosis; hyperlipidemia; hypertension; depression and anxiety.  D. l at 2.

In his decision, the ALJ also considered additional impairments noted in Cordero's medical records of median nerve entrapment of the left carpal tunnel, hip bursitis, substance abuse and panic disorder.  R. 10.

a.  Shoulder and Back Issues

Cordero first began complaining of mid and lower back pain and left shoulder pain in June 2005 after injuring himself at work on June 18, 2005.  R. 347.  On June 22, 2005, Dr. John Marshall, a chiropractor at Doctors Plus, a health clinic that provides chiropractic treatment and physical therapy, performed an initial examination of Cordero following this injury.  R. 347.  At this initial evaluation, Cordero complained of left shoulder and lower back pain, numbness in his left arm and left hand, and pain radiating down his right leg.  R. 347.  Dr. Marshall found the range of motion for Cordero's left shoulder was diminished by 50% due to extreme pain.  R. 348. Cordero had severe pain in his cervical and lumbar spine when moving.  R. 348.  Dr. Marshall recommended physical therapy, seeking pain medication from a medical doctor and having x– rays of his shoulder and spine.  R. 349. Dr. Marshall initially diagnosed Cordero with cervical, thoracic and lumbar spine strain/sprain; left shoulder strain/sprain; cervical and lumbar radiculitis; and cervical spondylosis.  R. 349.

From June 2005 to February 2008, Cordero saw chiropractors and other treatment providers at Doctors Plus two to three times a week for examinations of his back and left shoulder and physical therapy.  R. 347–468, 471–698.  He regularly received diversified adjustments to his spine, which Cordero stated provided temporary relief.  R. 356–85, 434.

Throughout these visits, Cordero continued to complain of pain in his back and left shoulder, but the treatment reports state that Cordero "tolerat[ed] his therapy well." See, e.g., R. 356. Cordero periodically reported improvements in his back and shoulder pain. See, e.g., R. 362 (stating on August 8, 2005 that mid-back pain is improving with adjustments), 371 (stating on August 29, 2005 that low back pain is getting better), 385 (reporting on October 13, 2005 that he is "feeling good" in his mid and lower back), 396 (stating on November 16, 2005 that his mid and low back pain was "doing great"). In his visits from December 21, 2006 to January 19, 2007, Cordero only mentioned his mid and lower back pain and did not complain of shoulder pain at all. R. 402–10.

    *i. Degenerative Joint Disease of the Left Shoulder*

During a neurological consultation on July 12, 2005, R. 352–53, Dr. Jeffrey Wishik reported his main concern was Cordero's left shoulder. R. 353. An MRI of Cordero's left shoulder performed on July 19, 2005 showed mild rotator cuff tendonopathy, trace fluid in the subacromial subdeltoid bursa and no evidence of an acute fracture. R. 242–43. On January 16, 2006, Dr. Marshall noted that while Cordero was making good progress on his lower back, his left shoulder was still a problem and needed surgery. R. 398. Dr. Marshall made Cordero an appointment with Dr. Jeffrey Gassman, an orthopedic surgeon. See R. 398–99. Dr. Gassman agreed that Cordero needed surgery on his left shoulder. R. 399. Dr. Gassman performed a distal clavical excision and subacromial decompression of Cordero's left shoulder on August 10, 2006. R. 249.

On August 22, 2006, Cordero saw Dr. Gassman for a post-surgical follow-up appointment. R. 286. Dr. Gassman reported that Cordero was healing nicely, had the expected

incisional pain and that a gentle range of motion was relatively comfortable.  R. 286.  He prescribed physical therapy and ice and ibuprofen as needed for pain.  R. 286.  Cordero continued to see Dr. Gassman for evaluations of his shoulder from 2006 to 2007.  R. 286–290.  On September 21, 2006, Cordero reported tightness and some pain, for which Dr. Gassman prescribed continued physical therapy and a new oral anti-inflammatory.  R. 286.  On November 9, 2006, Dr. Gassman stated that Cordero was "doing well with [the shoulder], although coming along slowly."  R. 287.  Dr. Gassman stated that Cordero would continue with physical therapy because "[Cordero] feels this is helping him substantially."  R. 287.  On December 19, 2006, Dr. Gassman reported that Cordero had a range of motion of 130 degrees of abduction and flexion, and noted that as Cordero's shoulder had healed as far as internal injuries, Cordero needed to mobilize his shoulder through daily exercise and continue physical therapy.  R. 288.  Dr. Gassman stated that Cordero "appeared surprised that he needed to work on this daily on his own, and . . . the issue here [is] that he has been babying this far too much."  R. 288.

On February 8, 2007, Cordero told Dr. Gassman he had reinjured his shoulder by landing on his arm when trying to sit down on the couch.  R. 289.  Dr. Gassman examined Cordero's shoulder and noted that Cordero's incision remained healed.  R. 289.  He suggested continued physical therapy to strengthen and mobilize his shoulder.  R. 289.  Cordero's final recorded visit to Dr. Gassman was on April 3, 2007.  R. 290.  Cordero explained that physical therapy was helping but that he still had some pain.  R. 290.  Dr. Gassman concluded that Cordero's shoulder was getting better, but did not yet have a full range of motion.  R. 290.  He suggested continued physical therapy and noted that Cordero was not ready to return to work.  R. 290.

Cordero was in a motor vehicle accident on November 4, 2007, which Cordero reported increased the pain in his back and other areas of his body, but he did not complain of shoulder pain during his post-accident evaluation by Dr. Marshall on November 7, 2007.  R. 457–59.  Dr. Marshall did not note any left shoulder pain and did not include shoulder injuries in his list of diagnoses causally related to the accident.  R. 457–60.

    ii.  *Spine Issues: Lumbar Disc Protrusion at L4-L5, Cervical Spondylosis*

A cervical spine MRI performed on July 1, 2005 showed a "slight straightening" of part of Cordero's cervical spine and mild cervical spondylosis.  R. 244–45.  On December 13, 2006, Dr. Marshall noted that he was concerned about Cordero's lower back and lumbar spine and would suggest an MRI if things did not improve.  R. 401.  On January 23, 2007, Dr. Marci Seronick, another chiropractor at Doctors Plus, recommended that Cordero have an MRI of his lumbar spine to rule out disc herniation.  R. 412.  A lumbar spine MRI performed on February 26, 2007 showed central and right sided disc herniation at the L4-L5 discs.  R. 251.  Cordero continued his treatment with Doctors Plus and reported on April 18, 2007 that the spine adjustments continued to give him temporary relief.  R. 434.  In June 2007, Dr. Stern, a neurosurgeon, recommended surgery on Cordero's lower back.  See R. 443.  The surgery was scheduled for August 2007, but was put on hold when it was denied by Cordero's insurance company.  R. 449.

During an examination performed by Dr. Charles Howland for Disability Determination Services ("DDS") on September 13, 2007, Cordero reported that his back pain interfered with his dressing, bathing and ability to drive.  R. 301.  Dr. Howland noted Cordero's history of chronic back pain and shoulder problems.  R. 303.  An examination of Cordero's spine on November 19,

2007 revealed flattening of the mid cervical contour, minute spondylosis and lumbar spine disc narrowing.  R. 327–28.  Images of Cordero's spine taken on January 17, 2008 showed continued L4-L5 disc herniation.  R. 345.  An MRI of Cordero's lumbar spine on January 4, 2010 showed broad based herniation of the L4-L5 discs on the right side, and new disc herniation at the L3-L4 discs.  R. 765.

Dr. Alan Marcovici saw Cordero for a neurosurgical consultation on February 24, 2010. R. 65, 797.[3]  Dr. Marcovici's exam showed paraspinal muscle tenderness and spasm.  R. 797. Dr. Marcovici explained that he believed much of Cordero's back pain was caused by his knee and ankle problems and that treatment for those issues would result in improvement in Cordero's back pain.  R. 797.

b.  Insulin Dependent Diabetes Mellitus, Hyperlipidemia and Hypertension

Cordero received treatment for diabetes mellitus, hypertension and hyperlipidemia from his former primary care physician, Dr. Naomi Rappaport, at the Greater New Bedford Health Center from July 2001 to May 2007.  R. 62–63, 300, 264–81.  Dr. Rappaport prescribed medication for his diabetes, hypertension, pain and hyperlipidemia.  R. 300–01.  A report from an October 2006 nursing visit evaluating Cordero's management of his diabetes showed that Cordero monitored his blood glucose once a day, exercised twenty to forty minutes every day on the treadmill, understood his diagnosis and the need for regular checkups as part of his treatment plan, and independently adhered to his prescribed diet plan.  R. 270.  Another diabetes management report from January 2007 showed that Cordero monitored his blood glucose only four times a week, exercised six times a week, failed to maintain bodyweight within normal

---

[3] Although this exam was after the ALJ hearing, the ALJ later received a summary of Dr. Marcovici's examination and considered it in reaching a decision.  R. 65, 797.

limits, and did "not always" assume responsibility for necessary life changes.  R. 273.  The January report did not indicate that Cordero understood the need for regular checkups.  R. 273.  Laboratory reports from January and April 2007 each showed Cordero had a glycol hemoglobin count consistent with a "diabetic intermediate well controlled."  R. 275.

        c.  <u>Obesity</u>

At the time of his application for disability in April 2007, Cordero was 5'10" and weighed 248 pounds.  R. 75–76.  The Federal Reviewing Official classified Cordero as having Class II obesity, R. 76, and stated that his obesity had a severe effect on his musculoskeletal impairments — his back, knee and ankle injuries.  <u>See</u> R. 76.  A record of a nursing visit on November 19, 2007 noted that Cordero failed to maintain his bodyweight within normal limits and listed his weight as 248 pounds.  R. 273.

        d.  <u>Left Ankle Instability Due to Ligament and Tendon Tear</u>

In April 2007, an MRI of Cordero's left ankle performed by Dr. David Adelberg revealed the absence of the anterior talofibular ligament and a chronic peroneous brevis tear.  R. 700.  Cordero was instructed to do physical therapy and use mid-foot support to help with his left ankle pain.  R. 700.  In March 2009, Cordero saw Dr. Bharti Khurana and reported a history of left ankle pain.  R. 738.  Dr. Khurana performed an MRI on March 14, 2009 and compared this MRI to the study of Cordero's ankle completed on April 30, 2007.  <u>See</u> R. 738.  The MRI showed a chronic full thickness tear of the peroneus brevis tendon, a chronic full thickness tear of the anterior talofibular ligament and no significant change since the 2007 study.  R. 738–39.  On April 2, 2008, in a Case Analysis of Cordero's disability claim, DDS found Cordero's left ankle issues to be severe.  R. 700.

     e.  <u>Degenerative Joint Disease of Both Knees</u>

On April 30 2007, Dr. Stephen Sweriduk performed an MRI of Cordero's left knee, which showed mild degeneration, but no meniscal tear.  R. 258–59.  Cordero was advised to continue physical therapy.  R. 700.  After Cordero's motor vehicle accident in November 2007, an image taken of his right knee did not show any bone or joint abnormalities.  R. 324.  Cordero discussed these images with Dr. Marshall who explained the findings were within normal limits.  R. 461.  On December 16, 2007, at the request of Cordero's primary-care physician, Dr. Rappaport, Dr. Ronald Chan evaluated Cordero's knees.  R. 735.  Dr. Chan found that Cordero had bilateral knee degenerative joint disease and prescribed a course of injections once a week for five weeks.  R. 735.  Dr. Chan did not report any complications or complaints from Cordero due to the injections.  R. 733, 735.  On April 2, 2008, DDS stated that Cordero's left knee impairment was severe, but did not meet listing requirements.  R. 700.

     f.  <u>Median Nerve Entrapment of the Left Carpal Tunnel</u>

Cordero complained of numbness in his fingers on his left hand during an exam on July 1, 2005, shortly after his initial report of disability.  R. 35, 244.  Dr. Wishik performed an electrodiagnostic evaluation of Cordero's left arm on August 23, 2005 and found evidence of median nerve entrapment at the left carpal tunnel and elicited a Tinel's signal[4] over the left median nerve at the carpal tunnel.  R. 246–47.  On October 13, 2005, Cordero was diagnosed with carpal tunnel syndrome in his left wrist and Cordero was advised wear a splint.  R. 386.  During a visit at Doctors Plus on February 6, 2007, Cordero reported some occasional tingling in his left pinkie and 4th finger, R. 414, but reported decreased tingling during a visit in March

---

[4] A Tinel's signal is a tingling sensation at the end of a limb produced by tapping the nerve at the site of compression or injury.  6 J.E. Schmidt, <u>Attorney's Dictionary of Medicine</u> T-143 (2012).

2007.  R. 426.  On April 2, 2008, DDS stated in a case analysis of Cordero's claim that there was no evidence on file to support Cordero's carpal tunnel allegation.  R. 700.

#### g.  Hip Bursitis

After Cordero's motor vehicle accident in November 2007, a radiological study of his right hip did not show any bone or joint abnormalities.  R. 324.  Dr. Marshall concluded that the findings were within normal limits.  R. 324, 461.  A bilateral hip MRI performed on January 30, 2008 revealed no hip fracture and some trochanteric bursitis.  R. 729.

#### h.   Mental Impairments: Depression, Anxiety, Panic and Substance Abuse

Cordero saw Dr. Guillermo Gonzalez for psychiatric care from 2005 to 2007.  R. 252–57, 305–08.  Dr. Gonzalez's records contain minimal treatment notes, consisting mostly of a list of symptoms for which Dr. Gonzalez provided a severity ranking of "0" (not present) to "5" (extreme) if he observed them.  R. 252–57, 305–08.  In the sessions with Cordero in which Dr. Gonzalez indicated he observed symptoms of anxiety and depression, he consistently rated them as a "3" or "moderately severe."  R. 254, 256–57, 307–08.  On April 10, 2006, March 12, 2007 and April 19, 2007, Dr. Gonzalez did not report observing symptoms of depression.  R. 252–53, 255.  On August 23, 2007, Dr. Gonzalez only reported observing symptoms of "moderately severe" anxiety.  R. 306.  On September 20, 2007, Dr. Gonzalez rated Cordero's symptoms of anxiety and depression as "moderate" or a "2."  R. 305.  Dr. Gonzales did not provide additional treatment notes to explain these rankings.  R. 252–57, 305–08.

On September 13, 2007, Dr. Howland provided a consultative psychological examination of Cordero for DDS.  R. 300–02.  When asked why he applied for disability, Cordero said he was applying due to severe back pain and shoulder, knee and ankle problems.  R. 300.  Cordero

complained to Dr. Howland of insomnia that was somewhat ameliorated by medication, frequent crying spells, some panic attacks, and physical symptoms associated with anxiety, such as rapid heartbeat and dizziness.  R. 301.  Cordero also explained that he had previously abused alcohol and cocaine for approximately fifteen years.  R. 301.  Cordero stated he stopped all cocaine use in 2003, and drank beer once in a while, despite being told by his doctor to stop completely.  R. 301.  Dr. Howland described Cordero as socially "quite isolated."  R. 302.  He reported that Cordero's affect was constricted and described his mood as anxious and depressed.  R. 302. Based on his examination, Dr. Howland diagnosed Cordero with panic disorder, dysthymia, alcohol and cocaine abuse in full remission and social isolation.  R. 303.  Dr. Howland concluded his report stating, "[a]s there appears to be a strong relationship between his physical condition and his mental symptoms, the prognosis is guarded."  R. 303.

From January to November 2009, Cordero saw psychiatrist Dr. Timothy Gendron. R. 773–96.  In January 2009, Cordero told Dr. Gendron that he was very depressed and cried a lot because he broke up with his girlfriend.  R. 782.  In February and April 2009, Dr. Gendron noted that Cordero was depressed and had some trouble sleeping.  R. 779–80.  In June 2009, Dr. Gendron noted that Cordero was doing better, but continued to feel depressed.  R. 778.  In July 2009, Cordero informed Dr. Gendron that he was back with his girlfriend and it was the "best he's felt in sometime."  R. 777.  Dr. Gendron assessed him as "doing better."  R. 777.  In August 2009, Dr. Gendron noted that Cordero was doing well, had a good mood and was stable.  R. 776. In November 2009, Dr. Gendron noted that Cordero was concerned about his medical problems, but he still considered Cordero relatively stable.  R. 775.  Dr. Gendron wrote that Cordero became more unstable when drinking.  R. 775.

On February 10, 2010, Raechel McGhee, a licensed clinical social worker, reported seeing Cordero approximately twice a month beginning in September 2009.  R. 770–71. McGhee diagnosed Cordero with bipolar disorder with a recent depressed episode, panic disorder without agoraphobia, severe major depressive disorder and polysubstance abuse in remission.  R. 770.  McGhee stated that Cordero was highly anxious, worried about his future and depressed.  R. 770.  She explained that Cordero needed to be "very vigilant" to prevent falling back into substance abuse when he becomes emotionally overwhelmed.  R. 770–71.  She concluded that Cordero would not be able to work at that time.  R. 771.

### 2.   *ALJ Hearing*

At the February 12, 2010 administrative hearing, the ALJ heard testimony from Cordero, Dr. Steven Kaplan, a medical expert, and Paul Murgo, a vocational expert ("VE").  R. 7.

### a.   Cordero's Testimony

Cordero testified that he had been previously employed as a customer service representative at an auto repair shop, a security guard and a shoe salesman.  R. 37–40.  He testified that he could not perform any of those jobs at the time of the hearing.  R. 41.

Cordero testified that he saw Dr. Rappaport, his primary care physician, for diabetes, high blood pressure, high cholesterol, allergies and "all kind[s] of stuff," R. 45, but most of his testimony was about his pain.  He testified that he had two herniated discs, and that the pain in his low back spread down his right leg to his knee and affected him "most of the time."  R. 41–42.  Cordero explained that a recent MRI showed a new herniated disc at L3-L4 that was causing pain in his left leg as well.  R. 57.  Cordero testified that he had a torn tendon and torn ligaments in his left ankle that bothered him when walking, and that his ankle "will just let go . . . most of

14

the time." R. 42. Cordero also stated that he had carpal tunnel in his right wrist. R. 59. He

testified that he is right-handed. R. 59. On a scale of one to ten, Cordero stated that his daily

average pain was an eight and that it increased with activity. R. 51. He testified that he could

barely walk at all, could only sit for twenty minutes to half an hour and woke up three to four

times a night due to pain. R. 47–48. When asked about his daily activities, Cordero testified that

he lies down for a couple hours a day, watches television, reads the Bible and "stays in the house

most of the time." R. 48–49, 55. He stated that he does not do housework, R. 55, drives

sometimes and goes to church. R. 49. He testified that he could cook simple meals, but that his

sister does most of the cooking. R. 55.

Cordero testified that he took Percocet on average two to three times a day to alleviate

pain and sometimes used heat to sleep. R. 43–45. He stated that a medication he takes causes

"upset stomach and sometimes pain in [his] liver." R. 45. Cordero stated that he had surgery on

his left shoulder in 2006, R. 52–53, had surgery scheduled on his left ankle for his torn tendon

and ligament, R. 51–52, and had a surgical consultation for his low back and herniated discs

scheduled shortly after the hearing. R. 53–54.

Regarding his mental health, Cordero testified that he saw a doctor monthly for

approximately one year for depression and anxiety. R. 46. He explained that his depression

caused him to lose interest in doing things, that he felt guilty and worthless and had trouble

concentrating and sleeping. R. 46–47.

### b. Medical Expert's Testimony

The medical expert, Dr. Kaplan, testified that based on his review of Cordero's medical

records, Cordero had three specific problems: the left shoulder "which is somewhat recovered,"

the left ankle, which he described as "the most significant abnormality," and a herniated disc on the left side of his back.  R. 65.  Dr. Kaplan also noted that Cordero's 2007 car accident worsened his symptoms.  <u>See</u> R. 62.  Dr. Kaplan testified that Cordero had "persistently abnormal L4-L5 with potential displacement of the exiting nerve root on the right side . . . the significant disc herniation."  R. 62.  He acknowledged that this could explain Cordero's back pain and some of the pain down his leg, and may need to be treated conservatively.  R. 65.

Regarding Cordero's left ankle, Dr. Kaplan testified that in 2007 Cordero had a "very abnormal ankle MRI and since that point . . . probably would be limited to sedentary work situations in terms of the . . . likelihood . . . that he'd have difficulty tolerating [being] on his feet six hours of the day."  R. 62.  He testified that an MRI in March 2009 showed a "severe anatomical abnormality" with a full thickness tear in one of the ligaments that holds the ankle in place.  R. 64.  He stated that a full thickness tear is "a serious problem" and that he was "surprised it wasn't repaired earlier."  R. 64.  Dr. Kaplan stated that he believed the left ankle "[was] the most significant abnormality."  R. 65.

Dr. Kaplan was questioned by Cordero's attorney about Cordero's knees.  R. 65–66.  Dr. Kaplan testified that while Dr. Chan "obviously thought [Cordero] had some significant complaints" there were no x–rays, MRIs or other objective findings to confirm any medical issues with Cordero's knees.  R. 66.  Dr. Kaplan did agree that Cordero's bad ankle could be negatively affecting his knees.  R. 66.  He further explained that he "think[s] the surgery of the ankle is really the key [to lessening Cordero's knee pain] and then afterwards other things might actually get better."  R. 66.

c.   <u>VE's Testimony</u>

16

The VE, Paul Murgo, began his testimony by asking Cordero for clarification about the type of work he did as a security officer and in surveillance.  R. 66–68.  The VE established that Cordero's security work, even when described as surveillance, involved standing and walking around.  R. 66–68.  The ALJ did not pose any hypothetical questions to the VE.  R. 66–68.  The VE testified that Cordero's previous work as a customer service representative at the auto repair shop was medium and at the lower end of skilled work; Cordero's work in security was light and semi–skilled work; his work in shoe sales was light and semi–skilled work; and that Cordero's work in both shipping/receiving and stocking were medium and un–skilled work.  R. 68.

    3.    Findings of the ALJ

Following the five–step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Cordero had not engaged in substantial gainful activity since June 15, 2005.  R. 9.  Cordero does not dispute the ALJ's finding at step one.

At step two, the ALJ found that Cordero had the following severe impairments: lumbar disc protrusion at L4-L5; insulin dependent diabetes mellitus; obesity; left ankle instability due to ligament and tendon tear; degenerative joint disease of both knees; and degenerative joint disease of the left shoulder, status-post arthroscopic subacromial decompression.  R. 10.  The ALJ found that Cordero's medically determinable impairments of left carpal tunnel, hyperlipidemia, hypertension, hip bursitis, cervical spondylosis, depression, substance abuse, anxiety and panic disorder were non-severe.  R. 10.  The ALJ concluded that Cordero's bipolar disorder and attention deficit disorder were not medically determinable impairments.  R. 12.  Cordero disputes the ALJ's step two finding that his left carpal tunnel, hyperlipidemia, hypertension, hip bursitis and cervical spondylosis are non-severe physical impairments.  D. 15

at 6.  Cordero also challenges the ruling at step two that his depression, substance abuse, anxiety and panic disorder are non-severe mental impairments.  D. 15 at 7.  He asserts the ALJ erred by ignoring McGhee's medical opinion when evaluating the severity of Cordero's mental impairments.  D. 15 at 9.  Cordero does not dispute that his bipolar disorder and attention deficit disorder are not medically determinable impairments.

At step three, the ALJ found that Cordero did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in  20 C.F.R.  § 404, Subpart P, Appendix 1.  R. 13.  Cordero does not dispute the ALJ's finding at step three.

Before reaching step four, the ALJ determined Cordero's RFC, finding that Cordero:

> has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he cannot perform any overhead reaching with his left arm, but can perform tasks with both arms at or below shoulder level. He cannot climb ladders, scaffolds, or rope.  He can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.  He must avoid concentrated exposure to extreme cold and hazards such as dangerous machinery and unprotected heights.

R. 13.  The ALJ determined that although Cordero's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Cordero's statements as to the intensity, persistence and limiting effects of his symptoms were not credible.  R. 16.

On the basis of this RFC finding, at step four, the ALJ determined that Cordero could not perform any of his past relevant work as a shipping/receiving clerk, stock person, security officer or shoe salesman.  R. 20.

At step five, the ALJ found that after considering Cordero's age, education, work experience and RFC, Cordero was limited to unskilled sedentary work, but there were jobs in significant numbers in the national economy that Cordero could still perform and therefore, Cordero was not disabled.  R. 20–21.  Cordero disputes the finding at step five including the

ALJ's evaluation of his credibility in assessing his RFC and his ultimate conclusion that he is not disabled.  D. 15 at 11–13.

### C.   Cordero's Challenges to the ALJ's Findings

Cordero contends that the ALJ erred by (1) finding at step two that his left carpal tunnel, hyperlipidemia, hypertension, hip bursitis, and cervical spondylosis were non-severe physical impairments; (2) finding at step two that his depression, substance abuse, anxiety and panic were non-severe mental impairments; (3) granting no evidentiary weight to McGhee, a licensed clinical social worker, when evaluating the severity of Cordero's mental impairments at step two; and (4) ascribing limited credibility to Cordero's statements about the intensity, persistence and limiting effects of his symptoms when making his RFC assessment.  For the reasons discussed below, Cordero's arguments fail.

#### 1.   The ALJ's Finding of Non-Severe Physical Impairments

Cordero argues that the ALJ erred by finding his physical impairments of median nerve entrapment of the left carpal tunnel ("left carpal tunnel"), hyperlipidemia, hypertension, hip bursitis and cervical spondylosis to be non-severe.  D. 15 at 6–7.  A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical or mental capacity to perform basic work activities.  20 C.F.R. § 404.1520.  Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying; seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to others and dealing with change.  20 C.F.R. § 404.1521(b).  The claimant must be disabled "by reason" of the severe impairment(s). Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at *1 (1985).  An impairment or combination of impairments is

not severe when medical and other evidence establish only a slight abnormality that would have only a minimal effect on an individual's ability to work.  20 C.F.R. § 404.1521; SSR 85–28, 1985 WL 56856, at *3.

When determining whether a medically determinable impairment is severe, the ALJ must carefully evaluate the medical findings which describe the impairment(s) and make an informed judgment about its limiting effect on an individual.  SSR 85–28, 1985 WL 56856, at *3.  The claimant carries the burden at step two to prove that he suffers from an impairment "that significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." White v. Astrue, No. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting Bowen v. Yuckert, 482 U.S. 137, 141–42 (1987)) (alteration in original) (internal quotation marks omitted).   To meet this burden, a claimant must use objective medical evidence to demonstrate that his impairment is severe.  Id.; 20 C.F.R. §§ 404.1520, 404.1529.

### a.   The ALJ's Finding that Cordero's Left Carpal Tunnel is Non-Severe is Supported by Substantial Evidence

Cordero argues that the ALJ erred by stating that Cordero had "virtually no complaints nor has he exhibited any objective signs that [his carpal tunnel] has any impact on his ability to function."  D. 15 at 6.  Cordero agrees with the ALJ's conclusion that Dr. Wishik's 2005 diagnosis of carpal tunnel on his left side makes carpal tunnel a medically determinable impairment.  D. 15 at 6; R. 10.  However, "[a] mere diagnosis of . . . [a condition], of course, says nothing about the severity of the condition."  Higgs v. Bowen, 880 F.2d 860, 863 (8th Cir. 1988); see White, 2011 WL 736805, at *6.  The record shows that Cordero complained of numbness in his left hand in July 2005, and a Tinel's signal was elicited over Cordero's left median nerve in August 2005.  R. 10, 246.  However, even considering this evidence, Cordero

fails to show that his left carpal tunnel significantly limits his ability to perform basic work activities.  See R. 185–90.  Although when questioned by his attorney at the hearing before the ALJ, Cordero stated his carpal tunnel was "bilateral but mostly [on his right side]," R. 59, no medical evidence supports his claim of carpal tunnel on the right side.  R. 244 (noting a history of numbness in only the left fingers), 246 (eliciting Tinel's sign over left median nerve), 700 (stating there is no evidence on file regarding Cordero's carpal tunnel).  In a 2007 Questionnaire on Pain submitted by Cordero, he listed pain in his left hand, not his right hand.  R. 182.  When asked on the questionnaire to describe how his impairments affect his ability to care for his hair and shave, Cordero wrote "I'm right handed — use right hand."  R. 185.  Although medical evidence established that Cordero's left carpal tunnel was a medically determinable impairment, R. 246, 386, 414, Cordero did not show that his left carpal tunnel significantly impaired his ability to do basic work activities, particularly given Cordero's testimony that he is right-handed. R. 185, 189.  Therefore, the ALJ properly concluded that Cordero's left carpal tunnel is non-severe.

> b.  The ALJ's Finding that Cordero's Hyperlipidemia, Hypertension, Hip Bursitis and Cervical Spondylosis are Non-Severe is Supported by Substantial Evidence

Cordero argues the ALJ erred by finding that Cordero's complaints about his hypertension, hyperlipidemia, hip bursitis and cervical spondylosis were "virtually nonexistent," and by considering the lack of medical restrictions placed on Cordero by his physicians as evidence of non-severity.  D. 15 at 7.  Cordero argues that his lack of medical restrictions is irrelevant because his physicians knew he had not worked since June 2005 and therefore understood that no medical restrictions were needed.  D. 15 at 7.

When determining whether an impairment is severe, the ALJ must make an informed judgment about its limiting effect on an individual based on an examination of all the medical findings.  SSR 85–28, 1985 WL 56856, at *4; see Bolduc v. Astrue, No. 09-220-B-W, 2010 WL 276280, at *2 (D. Me. Jan. 19, 2010).  Medical restrictions reflect a physician's opinion that an individual has a limited ability to do basic work activities.  See Hollis v. Bowen, 837 F.2d 1378, 1386–87 (5th Cir. 1988).  Therefore, the ALJ properly included the lack of medical restrictions placed on Cordero due to the above impairments in his severity analysis.

The ALJ relied on Cordero's own statements at his disability hearing and on objective medical evidence to conclude that Cordero's hyperlipidemia, hypertension, hip bursitis and cervical spondylosis are non-severe.  When asked by the ALJ why he cannot work, Cordero cited only the herniated discs in his lower back.  R. 41.  Cordero testified that he saw Dr. Rappaport for "diabetes, high blood pressure, [and] high cholesterol," R. 45, but did not indicate that any of these impairments affected his ability to do basic work activities.  R. 45.  On a Function Report Cordero completed in 2007, he listed diabetes, hyperlipidemia and hypertension and described his daily management of them, but did not note any limiting effects of these impairments.  R. 184–91.  While the record shows that Dr. Rappaport prescribed medication for diabetes, hypertension and high cholesterol, Dr. Rappaport's treatment records do not indicate that Cordero experienced significant side effects from these medications that limited his daily functioning.  R. 264–81, 301.

The ALJ also cited specific x-rays and MRIs to support his finding that Cordero's cervical spondylosis and hip bursitis are non-severe.  R. 10.  A radiological evaluation and MRI of Cordero's hip did not show any bone or joint abnormalities, and Cordero's chiropractor, Dr.

Marshall, stated that the results of these tests were within normal limits.  R. 324, 461.  The physicians who evaluated Cordero's cervical spine characterized any cervical spondylosis they observed as "mild" or "minute."  R. 244–45, 327–28.  It is the "prime responsibility" of the ALJ to weigh the evidence in the record, and therefore his determinations of the facts are reviewed deferentially.  Rodriguez v. Celebrezze, 349 F. 2d 494, 496 (1st Cir. 1965).  Therefore, the court affirms the ALJ's determination that Cordero's hypertension, hyperlipidemia, hip bursitis and cervical spondylosis are non-severe.

> 2.   *The ALJ's Finding that Cordero's Mental Impairments are Non-Severe is Supported by Substantial Evidence*

Cordero argues the ALJ erred by finding his depression, anxiety, substance abuse and panic disorder (collectively, "mental impairments") to be non-severe.  D. 15 at. 7.  Cordero contends the ALJ improperly relied on his statement that he applied for disability due to physical rather than mental impairments, incorrectly evaluated the treatment records of Dr. Gendron and Dr. Gonzalez, and improperly made a medical conclusion regarding Cordero's mental impairments.  D. 15 at 7–8.

When determining whether mental impairments are severe, the ALJ must follow the guidelines set forth in 20 C.F.R. § 404.1520a in addition to those in 20 C.F.R. § 404.1520.  Figueroa-Rodriguez v. Sec'y of Health & Human Servs., 845 F.2d 370, 372 (1st Cir. 1988); Rivera v. Astrue, 814 F. Supp. 2d 30, 34 (D. Mass. 2011).  First, the ALJ must evaluate the symptoms, signs and laboratory findings of the impairments to determine if they are medically determinable mental impairments.  20 C.F.R. § 404.1520a(b).  Next, the ALJ must rate the degree of functional limitation resulting from the medically determinable impairments on four broad functional areas:  activities of daily living; social functioning; concentration, persistence or

pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(b)–(c); Hutchinson v. Astrue, No. 10-30214-RWZ, 2012 WL 1642201, at *9 (D. Mass. May 9, 2012). The ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of symptoms and how functioning may be affected. 20 C.F.R. § 404.1520a(c). If the ALJ finds the claimant's degree of limitation in each of the first three areas to be "mild" or better, and no episodes of decompensation are identified in the fourth area, then the ALJ will conclude the claimant's mental impairment is non-severe. 20 C.F.R. § 404.1520a(d)(1); Moniz v. Astrue, No. 09-10149-PBS, 2010 WL 3703259, at *11 (D. Mass. Sept. 16, 2010). This evaluation of the limiting effects of the claimant's mental impairments on his daily functioning is separate from the RFC determination performed at steps four and five. 20 C.F.R. § 404.1520a. The ALJ's written decision must document the use of this technique by including the medical history and functional limitations that were considered in determining the severity of the mental impairments, as well as specific findings as to the degree of functional limitation in each of the four broad functional areas. 20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ properly followed 20 C.F.R. § 404.1520a to conclude that Cordero's mental impairments are non-severe. First, the ALJ relied on treatment records from acceptable medical sources to establish depression, anxiety, substance abuse and panic as medically determinable mental impairments. 20 C.F.R. §§ 404.1513(a), 404.1520a; R. 10–12. The ALJ considered records from Cordero's former psychiatrist, Dr. Gonzalez, R. 252–57, 305–08, Cordero's current psychiatrist, Dr. Gendron, R. 773–96, Dr. Howland at DDS, R. 300–03, Dr. Jane Metcalf, a non-examining state agency psychologist, R. 300–03, 309–22, and the testimony of the medical expert Dr. Kaplan. R. 58–66.

Next, the ALJ rated each of the four broad functional areas as required by 20 C.F.R. § 404.1520a.  R. 12.  In finding a "mild" limitation in each functional area, the ALJ relied in part on Cordero's statement to DDS that he was applying for benefits due to physical rather than mental impairments.  R. 10, 300.  Cordero made this same statement during his testimony to the ALJ when asked why he applied for disability benefits.  R 41, 46–48.  The ALJ may properly conclude that a mental impairment is not severe when the claimant does not list mental impairments as a cause of his disability.  Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 8 (1st Cir. 1982) (finding that substantial evidence supported ALJ's finding that plaintiff did not have a severe mental impairment where, inter alia, he did not list any mental problems when first applying for disability); see Mattos v. Astrue, No. 07–235, 2009 WL 890929, at *4 (D.R.I. Mar. 31, 2009).  Although Cordero mentioned anxiety and depression at points throughout his testimony, he did not do so when asked his reason for needing disability.  R. 41.  Cordero's failure to include his mental impairments as reasons for applying for disability supports the ALJ's conclusion that Cordero's mental impairments are non-severe.  R. 10; see Goodermote, 690 F.2d at 8; Mattos, 2009 WL 890929, at *4.

Regarding Cordero's substance abuse, the ALJ relied on medical records that described Cordero's substance abuse as in "full remission."  R. 303.  In 2007, Cordero reported to Dr. Howland that he stopped using drugs and alcohol in 2004, and had only an occasional drink. R. 303.  In 2009, Dr. Gendron noted occasional alcohol and drug use, but did not note any specific complaints from Cordero about substance abuse limiting his daily activities.  R. 778–79. In November 2009, despite noting that Cordero had "relapsed" into drinking again, Dr. Gendron still evaluated Cordero as "relatively stable."  R. 775.  These treatment records and medical

opinions support the ALJ's conclusion that Cordero's substance abuse is non-severe because it does not significantly limit his ability to do basic work activities.   20 C.F.R.§§ 404.1520, 404.1520a.

The ALJ also relied on the conclusions of both Dr. Metcalf and Dr. Howland that Cordero's activities of daily living were mostly limited by pain, not by his mental impairments. R. 321 (stating that Cordero's "[activities of daily living] are mostly limited by pain"), 303 (noting that his diagnoses of chronic depression and panic disorder were "guarded" because they seemed strongly related to Cordero's pain from his physical impairments).   Cordero's testimony and written answers on forms he completed prior to his ALJ hearing support these conclusions. R. 46–47, 182–91.   During his testimony, Cordero stated that had feelings of guilt and worthlessness, lost interest in doing activities and suffered panic attacks, but did not indicate that these issues caused more than a mild limitation on his daily activities.   R. 46–47, 183 (indicating that he socialized daily).   Cordero indicated a desire to do more physical activities, but did not indicate that his mental impairments limited him from doing these activities.   R. 56.   When asked what prevented him from working, he said his low back pain.   R. 41.   Additionally, in a Function Report completed in 2007, Cordero indicated the significant effects of his pain on his daily activities, R. 186 (stating that he was "constantly in pain" and unable to do any of the activities described on the form), but did not indicate that his mental impairments caused similar limitations.   R. 184–91.   Cordero wrote that he experienced nervousness, had difficulty concentrating and following instructions, and did not like being around people, R. 189–91, but still was able to go to church regularly and have conversations on the phone and in person once in a while.   R. 188.   Given the ALJ's consideration of objective evidence, statements and records

from acceptable medical sources, and Cordero's own testimony, the Court upholds the ALJ's conclusion that Cordero's mental impairments are non-severe.

The ALJ's determination that Cordero's mental impairments are non-severe is not an inappropriate "medical conclusion" as Cordero contends.  In Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 7 (1st Cir. 1988), which Cordero cites to support his argument, the court found the ALJ erred by failing to evaluate the claimant's RFC and by not consulting a doctor about the claimant's physical limitations.  Id. at 6–7.  Here, the ALJ properly considered various medical opinions regarding Cordero's mental impairments prior to evaluating his RFC. R. 10–13.  The ALJ did not make a "medical conclusion" outside his expertise like that of the ALJ in Rivera-Torres.  837 F.2d at 7.

      3.     *The ALJ did Not Err by Granting No Evidentiary Weight to McGhee When Evaluating the Severity of Cordero's Mental Impairments*

Cordero argues that the ALJ erred by ignoring McGhee's letter dated February 10, 2010 when determining the severity of Cordero's mental impairments.  Pl. Br. 9–10.  Cordero also contends that the ALJ improperly concluded that McGhee could not assess the severity of Cordero's medically determinable impairments.  D. 15 at 10.

Cordero mischaracterizes the ALJ's treatment of McGhee's opinion.  See D. 15 at 10.  As Cordero concedes, McGhee, a licensed clinical social worker, is not an acceptable medical source as defined in 20 C.F.R. § 404.1513(a), and therefore her opinion cannot establish the existence of a medically determinable impairment.  R. 11; D. 15 at. 9.  However, contrary to Cordero's contention, the ALJ did not conclude that  McGhee could not speak to the severity of Cordero's mental impairments, but rather fully considered McGhee's opinion in accordance with SSR 06–03p.  R.11; SSR 06–03p, 2006 WL 2329939, at *2 (explaining that "other sources" may

provide evidence regarding the severity of a medically determinable impairment).  The ALJ fully explained his reasoning for granting no weight to McGhee's opinion as to the severity of Cordero's substance abuse and depression.  R. 11.  The ALJ stated that McGhee's opinion was inconsistent with the record as a whole, was not substantiated by any treatment notes and that her conclusion that Cordero would be unable to work was a decision reserved to the Commissioner. R. 11, 770–71.  According to 20 C.F.R. § 404.1527(c) which governs the evaluation of medical opinions, the ALJ may give less weight or no weight to a medical opinion for each of these aforementioned reasons. See Avery v. Astrue, No. 11-30100-DJC, 2012 WL 4370270, at *10 (D. Mass. Sept. 21, 2012) (explaining that the ALJ may give less weight to a treating source's opinion if it is inconsistent with the record as a whole);  Foley v. Astrue, No. 09–10864–RGS, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) (stating that a treating physician's statement that a claimant is unable to work is entitled to no deference because it is not a medical opinion); Blanchette v. Astrue, No. 08–CGV–349–SM, 2009 WL 1652276, at *7 (D.N.H. June 9, 2009) (finding that the ALJ properly gave less weight to a treating source's opinion that was not supported by treatment records or tests).  Therefore, the ALJ properly evaluated McGhee's opinion as to the severity of Cordero's mental impairments and sufficiently explained his reasoning for granting it no evidentiary weight.

4.      *The ALJ did Not Err by Ascribing Limited Credibility to Cordero's Statements about the Intensity, Persistence and Limiting Effects of his Symptoms*

Cordero argues that the ALJ failed to evaluate his subjective complaints of symptoms fairly and accurately as required by SSR 96–7p and Avery v. Sec'y of Health & Human Servs., 797 F.2d 19 (1st Cir. 1986).  D. 15 at 11–12.  There is a two-step process for evaluating the

credibility of a claimant's statements about his symptoms, such as pain. SSR 96–7p, 1996 WL 374186, at *2 (Jul. 2, 1996). The ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id.; 20 C.F.R. § 404.1529(b). Here, the ALJ found that Cordero's medically determinable physical impairments could reasonably be expected to cause his alleged symptoms. R. 16.

If such an underlying impairment has been shown to exist, the ALJ moves to step two of the credibility analysis. 20 C.F.R. § 404.1529. The ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id.; SSR 96–7p, 1996 WL 374186, at *2. If an individual's statements about his symptoms are not supported by objective medical evidence, the ALJ must determine the credibility of the individual's statements based on a consideration of the entire case record, including medical signs and laboratory findings, the individual's own statements, any statements or information provided by treating or examining physicians, psychologists and other persons about the symptoms and how they affect the individual and any other relevant evidence in the record. SSR 96–7p, 1996 WL 374186, at *1–2. The ALJ's decision must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4.

At step two of the credibility analysis, the ALJ found that Cordero's statements about the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that

they were inconsistent with the ALJ's RFC assessment.  R. 16.  During the hearing, the ALJ properly questioned Cordero about his daily activities, frequency and intensity of symptoms, precipitating or aggravating factors, effectiveness or side effects of medications, the type of treatment prescribed for him and any functional restrictions placed on him.  R. 41–50; Avery, 797 F.2d at 23; SSR 96–7p 1996 WL 374186, at *3.  The ALJ relied on statements from both Cordero and his girlfriend that Cordero can run errands, maintain personal hygiene, shop, drive, do laundry, cook simple meals and watch television.  R. 18, 41–50.  While the ability to perform daily activities does not prove that a claimant is "not disabled," the ALJ may use evidence of performance of daily activities to support a negative credibility finding.  Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (determining that performance of household chores should be considered when determining credibility); see Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir. 1991) (finding complaints of pain not credible because claimant could drive and walk without assistance).  Here, the ALJ properly considered Cordero's ability to engage in daily activities as support for his finding that Cordero's statements regarding the severity of his symptoms were not credible.  The ALJ also compared Cordero's complaints of pain in his knees, left ankle, left shoulder and lower back to the objective medical evidence of each impairment.  R. 17.  For instance, the ALJ pointed out that despite the 2006 surgery to repair his shoulder and subsequent reports from treatment providers that Cordero's shoulder was healing well, Cordero continued to complain of significant pain.  R. 17, 287–89.  The ALJ may rely on objective medical evidence that demonstrates improvement in physical impairments to support his conclusion that complaints are not credible.  SSR 96–7p, 1996 WL 374186, at *6; 20 C.F.R. § 404.1529(c)(2).

Regarding Cordero's complaints about his mental impairments, the ALJ relied on Cordero's statement that he applied for disability benefits due to physical rather than mental impairments, his inconsistent complaints about his mental impairments, and gaps in his psychiatric treatment to conclude the complaints were not credible. R. 16–17, 300. The ALJ also relied on the lack of diagnostic testing for mental impairments performed by Dr. Gonzalez and Dr. Gendron, and Dr. Gendron's repeated statements that Cordero was stable and doing better throughout his 2009 treatment. R. 252–57, 305–08, 773–96. Given the ALJ's specific findings, each supported by the record, for his determination that Cordero's complaints about his mental impairments were not credible, this Court concludes that such conclusion was supported by substantial evidence.

In determining Cordero's overall credibility, the ALJ specifically relied on Dr. Gassman's 2006 statement that Cordero was "babying" his left shoulder. R. 18, 288. Cordero contends that the ALJ misinterpreted this statement and should have re-contacted Dr. Gassman about his opinion before using it to undermine Cordero's credibility. D. 15 at 14. Generally, an ALJ must re-contact a treating physician only if the evidence from such physician is inadequate for the ALJ to make a disability determination. Valiquette v. Astrue, 498 F. Supp. 2d 424, 434 (D. Mass. 2007). Here, however, Dr. Gassman's statement was contained within detailed treatment records that showed that Cordero's shoulder injury had healed, yet Cordero continued to complain of substantial pain and a limited ability to function. R. 18, 287–89. Further, the ALJ relied on opinions from multiple acceptable medical sources in determining Cordero's overall ability to function. R. 17–20. Therefore, the ALJ had adequate evidence to evaluate Cordero's credibility and was not required to re-contact Dr. Gassman about this specific

statement.  The ALJ properly considered Dr. Gassman's judgment about the nature and severity of Cordero's physical impairments as a factor in assessing Cordero's credibility in accordance with 20 C.F.R. § 404.1527.

"A credibility determination by the ALJ, who observed the claimant, evaluated [his] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Autrey v. Astrue, No. 10-30150-MAP, 2011 WL 1564442, at *4 (D. Mass. Apr. 25, 2011) (quoting Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir.1987)) (internal quotation marks omitted).  Here, given the ALJ's specific findings, the Court concludes there was substantial evidence to support the ALJ's determination that Cordero's subjective complaints were not credible and upholds the ALJ's credibility determination.

## V.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Cordero's motion to reverse is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

32